# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| BARBARA L. SAGER, ESQ., | **:** | |
| Plaintiff, | **:** | |
| | | Case No. 3:05cv00062 |
| -vs- | **:** | |
| | | District Judge Thomas M. Rose |
| COOLIDGE WALL WOMSLEY | **:** | Magistrate Judge Sharon L. Ovington |
| & LOMBARD CO., L.P.A., et al., | | |
| | **:** | |
| Defendants. | | |
| | **:** | |

# REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

When attorney Barbara L. Sagar became a shareholder of the law firm of Coolidge Wall Womsely & Lombard Co., L.P.A. ("Coolidge Wall") she signed a Shareholders' Agreement promising to arbitrate any dispute that might arise out of the Shareholders' Agreement.  Whether this requires Sager to arbitrate the claims she raises in the instant case must now be resolved due to the following presently pending Motions and related Memoranda and Exhibits:

1. Defendants' Motion to Dismiss (Doc. #6), Sager's Motion for Rule 56(f) Relief and Memorandum Contra Defendants' Motion to Dismiss (Doc. #s 16, 19), and Defendants' Reply (Doc. #s 24, 25);

2. Sager's Omnibus Motion to Convert Defendants' Motion to Dismiss to Motion for Summary Judgment; Request for Extended Deadline for the Parties to Submit Evidence; Request for Evidentiary Hearing; Request for Oral Argument (Doc.

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

#26), Defendants' Memorandum in Opposition (Doc. # 27), and Sager's Reply (Doc. #28);

3.      Defendants' Motion for a Protective Order (Doc. #10), Sager's Memorandum in Opposition (Doc. #17), and Defendants' Reply (Doc. #23).


## II.      BACKGROUND

### A.      <u>Sager's Complaint and Affidavit</u>

After graduating from law school, Sagar worked as an attorney in New York and Washington, D.C., practicing corporate law as well as mergers and acquisitions.  Defendants, apparently impressed with Sager's abilities, recruited her to join Coolidge Wall's corporate law department as an associate attorney.  (Doc. #1 at 7).  She began working for Coolidge Wall as an associate attorney in 1994.

Sager explains in her affidavit:

> When I was hired 1994, I was not shown the shareholder agreement or told that it was not negotiable, despite the fact that the firm hired me with the express expectation that I would be eligible for shareholder admission in two years.  I was not told when I was hired or at any time during the first two years of my employment that I would be required to sign an agreement with a mandatory arbitration provision in order to be admitted as a shareholder.  I made it known to various firm shareholders that I was opposed to mandatory arbitration provisions in agreements on many occasions.

(Doc. #16, Exh. 1, ¶19).

Sager continued to impress during her initial years with Coolidge Wall, a fact reasonably drawn from Defendants' decision to offer her a promotion to shareholder status.  Sager accepted.  In June 1996 she became a shareholder in Coolidge Wall.

Sager states in her Complaint, "Shareholder status at Defendant Coolidge Wall was governed by a Shareholder Agreement and Code of Regulations.  The Code provided that

2

shareholders could not be admitted or expelled without unanimous vote...."  (Doc. #1 at 7).

Sager alleges that when Defendants offered her shareholder status, she attempted to negotiate

several terms of the Shareholders' Agreement including the mandatary arbitration provision.

Defendants rejected her attempt, telling her that "nothing in the agreement was subject to

negotiation and that [she] would have to take it or leave it.  [She] was told that no shareholder

had ever been permitted to negotiate the terms of the agreement."  (Doc. #16, Exh. 1 at ¶19).

Sager maintains that she was one of Coolidge Wall's "highest billing attorneys, regularly

billing more work hours annually than male colleagues in similar positions."  (Doc. #1 at 7).  She

also "marketed and brought in new clients as well as retained existing clients."  (Doc. #1 at 7).

Despite these successes, according to Sager, Defendants compensated her less than similarly

situated male attorneys regardless of work performance.  Sager also claims that Defendants

transferred clients from older or retiring shareholders to younger male attorneys rather than to

younger female attorneys.  This system allegedly skewed the annual evaluations and

compensation adjustments to the detriment of female attorneys including Sager.  (Doc. #1 at 7-

8).

Sager alleges that Defendants subjected her to a hostile work environment and treated her

differently than similarly situated male colleagues by openly criticizing her for being involved in

a romantic relationship.  (Doc. #1 at 8).

Sager states that sometime before 2003 "a lawsuit was filed and a client claim was made

against Defendant Coolidge Wall in which Sager and similarly situated male colleagues were

involved.  With regard to these two actions, Sager was treated differently than similarly situated

male colleagues as a result of her sex as a female attorney."  (Doc. #1 at 8).

Sager alleges, "In June, 2003, Defendant Coolidge Wall's Executive Committee issued an ultimatum to Sager to either resign or receive a large salary decrease...."  Sager did not resign but instead "appealed the salary decrease."  (Doc. #1 at 8).

A few months later, in October 2003, Defendants "unlawfully amended the Code of Regulations, while simultaneously excluding Sager's participation and vote, in a manner to expedite ousting her from her employment at Defendant Coolidge Wall."  (Doc. #1 at 9).  She explains:

> I received notice of a special meeting of Firm shareholders to be held on October 29, 2003 to vote on an amendment to the Firm's Code of Regulations to eliminate the unanimous vote requirement for expulsion of a shareholder and substitute an 80% vote requirement.  The firm was trying to retroactively change that provision to a date that preceded my admission as a shareholder in 1996.  I attended the October 29 meeting, but was asked by Steve Herbert to leave the room and consult with my attorney.  While I was out of the room, the vote was taken without my knowledge or participation.  I was therefore deprived of the right to participate in and debate this action that was being proposed in order to deprive me of my rights as a shareholder.  Firm management knew that they could not achieve a unanimous vote under the Code of Regulations, so they proposed this amendment.  I did not leave the meeting voluntarily and did not consent to having the vote take place without me.  While I was out of the room, the shareholders voted to amend the Code of Regulations to eliminate the unanimous vote requirement for a shareholder's expulsion and made this change effective as of a date prior to my admission as a shareholder....

(Doc. #16, Exh. 1 at ¶24).  Defendants acknowledge in their Motion to Dismiss, "on November 7, 2003, Barbara Sager, a nineteen ... year lawyer and Coolidge Wall shareholder since 1996, was expelled from the firm by a vote of at least eighty percent ... of the other firm shareholders."  (Doc. #6, Memo. at 1).

Sager's Compliant raises claims of sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §2000e, *et seq*., and the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. §206(d)(1).  Sager also raises a claim under the Employee Retirement

Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §1001, *et seq.*, as well as numerous claims under Ohio law. Defendants are Coolidge Wall and numerous Coolidge Wall attorneys. Sager's Complaint groups the individual attorneys into "Shareholder Defendants" or "Compensation Committee Defendants" or "Executive Committee Defendants." (Doc. #1 at 6).

### B. **The Parties' Arbitration Provision**

The parties agree that the arbitration provision in Coolidge Wall's Shareholders' Agreement states:

> Any dispute or controversy arising under this Agreement shall be determined and settled by arbitration by a three-person arbitration panel under the Rules of the American Arbitration Association. Each side in the dispute shall promptly (no later than 20 days after the giving of notice of intent to arbitrate) select one arbitrator, and the two arbitrators so selected shall promptly select a third arbitrator. A decision of a majority of the three arbitrators shall be final and binding upon the parties and shall be enforceable in any court having jurisdiction over the party or parties against whom enforcement is being sought. The Shareholders agree that in any arbitration proceedings hereunder all financial data relating to the Corporation and the individual Shareholders shall be treated as confidential information and shall not in any way be disclosed or made available to the public and that no information subject to the attorney-client privilege shall be used or disclosed in any manner whatsoever.

(Doc. #6, Exh. A; Doc. #16 at 13-14).

### C. **The Parties' Motions**

Defendants contend in their Motion to Dismiss that all of Sager's claims must be dismissed based on the Federal Arbitration Act ("FAA"), 9 U.S.C. §1, *et seq.* and on the Ohio Arbitration Act, Ohio Rev. Code §§2711.02 or 2711.03, due to the validity and effect of the binding arbitration agreement between Sager and Defendants. Defendants characterize this as "the primary basis for Coolidge's Motion to Dismiss...." (Doc. #27 at 3).

Sager opposes Defendants' Motion to Dismiss along two tracks: one procedural based, the other merits based. Procedurally, Sager views the issue of whether her claims must be arbitrated pursuant to the FAA as not involving a Rule 12(b)(1) dispute over this Court's subject matter jurisdiction but instead involving a dispute controlled by Rule 12(b)(6). This view permits Sager to argue that Defendants' Motion to Dismiss under Rule 12(b)(6) must be converted to a Motion for Summary Judgment and that she is entitled to discovery because Defendants based their Motion on evidence beyond her Complaint. Sager also argues that this entitles her to an evidentiary hearing and to oral argument. As to the merits of Defendants' Motion to Dismiss, Sager contends that the Motion fails under the FAA and Ohio Arbitration Act for many reasons, most significantly because the arbitration provision is invalid and unenforceable.

## III.    APPLICABLE STANDARDS

### A.    <u>Rules 12(b)(1) and 12(b)(6)</u>

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits dismissal of a Complaint due to the lack of subject matter jurisdiction. "A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) may either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction. When a Rule 12(b)(1) motion attacks the factual basis for jurisdiction, the district court must weigh the evidence and the plaintiff has the burden of proving that the court has jurisdiction over the subject matter." *Golden v. Gorno Bros., Inc*., 410 F.3d 879, 881 (6th Cir. 2005)(citing *DLX, Inc. v. Kentucky,* 381 F.3d 511, 516 (6th Cir. 2004)).

A Motion to Dismiss under Rule 12(b)(6) requires the Court to accept as true the factual allegations in the Complaint and construe them in the light most favorable to the plaintiff.

*Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005). A Motion to Dismiss under Rule 12(b)(6) may be granted only if the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle him or her to relief. *Id*.

When Ruling on a Rule 12(b)(6) Motion, the Court "need not accept as true legal conclusions or unwarranted factual inferences." *Id*.; *see Mixon v. State of Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). A Rule 12(b)(6) Motion is often a proper procedural device for resolving pure questions of law. *E.g., Brookings v. Clunk*, 389 F.3d 614, 617-23 (6th Cir. 2004).

When considering a Motion to Dismiss under Rule 12(b)(6), the Court may not ordinarily consider materials outside the pleadings. *See Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989). Yet, when a plaintiff attaches exhibits to the Complaint, the exhibits become part of the pleadings and may be considered by the Court when ruling on Rule 12(b)(6) Motion. *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997)(relying in part on Fed. R. Civ. P. 10(c)). Similarly, "documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referenced to in the plaintiff's complaint and are central to her claim." *Weiner*, 108 F.3d at 89 (quoting *Venture Assoc. v. Zenith Data Sys*., 987 F.2d 429, 431 (7th Cir. 1993)).

If the Court, when accepting plaintiff's allegations as true under Rule 12(b)(6), concludes that those allegations are insufficient as a matter of law, it is not an abuse of discretion to limit discovery. *Flaim v. Medical College of Ohio*, __ F.3d __, __, 2005 WL 1971107 at *12 (6th Cir., Aug. 17, 2005).

**B.** **Analysis**

7

Defendants contend, based on *Dalton v. Jefferson Smurfit Corp.*, 979 F.Supp. 1187 (S.D. Ohio 1997)(Dlott, D.J.), that the issue of whether Sager's claims must be arbitrated is properly analyzed under Fed. R. Civ. P. 12(b)(1) not Rule 12(b)(6), and as a result, Sager is not entitled to discovery or to an evidentiary hearing. (Doc. #27 at 3-4).  To the extent Defendants seek to compel arbitration based on Rule 12(b)(1), they misperceive the basis for compelling arbitration. Defendants, however, also rest their Motion on the FAA, which is the proper basis for seeking to compel arbitration.  *See* 9 U.S.C. §§2-3.  A Motion to Dismiss based on an arbitration agreement "is not a motion which comes within the ambit or Rule 12(b) of the Federal Rules of Civil Procedure, which allows a defendant to move to dismiss on, among other things, grounds that the court lacks subject matter jurisdiction or that the plaintiff's claim fails to state a claim upon which relief can be granted.  Instead, the standards for ruling on [a party's] Motion is defined by the Federal Arbitration Act...."  *Raasch v. NCR Corp.*, 254 F.Supp.2d 847, 851 (S.D. Ohio 2003)(Rice, D.J.); *see Scovill v. WSYX/ABC*, 312 F.Supp.2d 955, 960 (S.D. Ohio 2004)(Sargus, D.J.).  Care must therefore be taken not to mix the issue of whether the FAA requires Sager to arbitrate her claims with the standards applicable under Rule 12(b)(1) to determining whether a Complaint must be dismissed for lack of subject matter jurisdiction.  There is, moreover, no doubt that this Court has subject matter jurisdiction over Sager's claims because the face of her Compliant raises Title VII and other federal claims over which this Court has subject matter jurisdiction.  *See* 42 U.S.C. §2000e-5(f)(3); *see also* 28 U.S.C. §1331; *Parilla v. IAP Worldwide Services VI, Inc.*, 368 F.3d 269, 274 (3rd Cir. 2004).

This does not mean, however, that Defendants' Motion to Dismiss must be converted to a Motion for Summary Judgment as Sager requests, because it can be resolved by consideration of

Sager's Complaint, her affidavit, and the Shareholders' Agreement.  Although the Shareholders' Agreement is outside Sager's Complaint, it is a document referenced in the Complaint, *see* Doc. #1 at 7, and it is central to her claims because the Shareholders' Agreement created Sager's shareholder status, the termination of which triggered the present case.

In addition, although Sager's affidavit is outside her Complaint, the factual allegations in her affidavit are consistent with those raised in her Complaint and differ only by providing more specific information in support of her claims.  This Report accepts Sager's factual allegations as true and construes them in her favor, while rejecting any contrary factual allegations and evidence submitted by Defendants.  In so doing, the dispositve issue of the presently pending Motions – whether Sager must arbitrate her claims – may be resolved prior to discovery and without an evidentiary hearing without causing prejudice to Sager's ability to oppose Defendants' Motion to Dismiss.  At best to Sager, further discovery will simply confirm the specific facts raised in her affidavit, and it is upon these facts which this Report rests.

Accordingly, Sager's Motion for Rule 56(f) Relief lacks merit.

## IV.     THE FAA AND THE PARTIES' AGREEMENT

### A.     <u>The FAA and Sager's Claims</u>

The FAA expresses a strong public policy in favor of arbitration agreements by mandating the enforcement of such agreements.  *Cooper v. MRM Investment Co.*, 367 F.3d 493, 498 (6th Cir. 2004).  Section 2 of the FAA provides that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract."  9 U.S.C. §2.  "If the parties contract to resolve their disputes in arbitration rather than in the courts, a party may not renege on that contract absent the most extreme

circumstances." *Stout v. JD Byrider*, 228 F.3d 709, 715 (6th Cir. 2000).

Because Sager signed, albeit reluctantly, the Shareholders' Agreement, she agreed with Defendants to be bound by its provisions including its mandatory arbitration provision. "One who signs a contract is presumed to know its contents, and ... if [s]he has had an opportunity to read the contract which [s]he signs [s]he is bound by its provisions." *Stout*, 228 F.3d at 715 (citation omitted). Given the parties' agreement to arbitrate, a two-part inquiry resolves whether Sager must proceed to arbitration pursuant to the FAA: First, the Court determines whether her claims are generally subject to compulsory arbitration; and if so, the Court determines whether the arbitration agreement is valid and enforceable. *Morrison v. Circuit City Stores, Inc*., 317 F.3d 646, 665 (6th Cir. 2003). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp*., 460 U.S. at 1, 24-25 (1983).

As the party resisting arbitration, Sager "bears the burden of proving that the claims at issue are unsuitable for arbitration." *Morrison*, 317 F.3d at 659.

Sager's sex discrimination claims under Title VII are subject to compulsory arbitration under the FAA, *see Morrison*, 317 F.3d at 665, as is her claim under the Equal Pay Act, *see Wedding v. University of Toledo*, 89 F.3d 316, 318-19 (6th Cir. 1996); *see also Steele v. L.F. Rothchild & Co*., 701 F.Supp. 407, 408 (S.D.N.Y. 1988), as is her ERISA claim, *see Simon v. Pfizer Inc*., 398 F.3d 765, 774 (6th Cir. 2005)(noting "the majority of courts considering this issue have held that disputes arising under ERISA ... are subject to arbitration under the FAA"). Sager's many claims under Ohio law are generally subject to compulsory arbitration under the FAA, particularly since these claims derive from the parties' employment relationship and

10

shared ownership of Coolidge Wall.  *See Dantz v. Apple Ohio LLC*, 277 F.Supp.2d 794, 796, 800-04 (N.D. Ohio 2003)(claims of unjust enrichment, sexual harassment, negligent retention, retaliation, promissory estoppel, breach of contract, spoliation of evidence subject to mandatory arbitration); *see also Wilson Elec. Contractors, Inc. v. Minnotte Contracting Corp*., 878 F.2d 167, 168-69 (6th Cir. 1989)(breach of contract dispute subject to arbitration); *Orcutt v. Kettering Radiologists, Inc*., 199 F.Supp.2d 746, 748-49, 756-577 (S.D. Ohio)(Rice, C.J.)(11 claims, most under Ohio law, subject to mandatory arbitration including retaliation and sex discrimination in violation of Ohio statutes and public policy, breach of contract, and intentional infliction of emotional distress).

Because each of Sager's claims is subject to mandatory arbitration, the Court turns next to whether the parties' arbitration agreement is valid and enforceable.  *Morrison*, 317 F.3d at 665.

### B.    The Arbitration Provision and Unconscionability

#### 1.
#### Unconscionability under Ohio Law

Sager contends that the arbitration provision is invalid and subjection to revocation because it is unconscionable under Ohio law.

Arbitration depends on agreement.  *See Floss v. Ryan's Family Steak Houses, Inc*., 211 F.3d 306, 314 (6th Cir. 2000).  Consequently, "state law contract defenses such as fraud, duress, and unconscionability may be applied by the courts to invalidate arbitration agreements." *Fazio v. Lehman Brothers, Inc*., 340 F.3d 386, 396 (6th Cir. 2003)(citing *Doctor's Assocs., Inv. v. Casarotto*, 517 U.S. 681, 687 (1996)); *see First Options of Chicago, Inc. v. Kaplan*, 514 U.S.

938, 944 (1995). Ohio contract law controls whether the arbitration provision in the Shareholders' Agreement is valid and enforceable. *See Kaplan*, 514 U.S. at 944; *see also Morrison*, 317 F.3d at 666.

"Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party...." *Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376, 383 (1993). "Arbitration clauses are unconscionable where the 'clauses involved are so one-sided as to oppress or unfairly surprise [a] party...." *Eagle v. Fred Martin Motor Co*., 157 Ohio App.3d 150, 163 (2004)(citing and quoting parenthetically *Orlett v. Suburban Propane*, 54 Ohio App.3d 127, 129 (1989)("explicating that an unconscionable arbitration clause exists '[when with respect to the arbitration clause itself] one party has been misled as to the 'basis of the bargain,' where a severe imbalance in bargaining power exists, or where specific contractual terms are outrageous.'")(other citations omitted).

"Under Ohio law, the unconscionability doctrine has two components: (1) substantive unconscionability, *i.e.*, unfair and unreasonable contract terms, and (2) procedural unconscionability, *i.e.*, individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible. Both elements must be proven to find a contract unconscionable." *Morrison*, 317 F.3d at 666 (citations omitted).

**2.**
**<u>Substantive Unconscionability</u>**

Whether an agreement is substantively unconscionable focuses on the actual terms of the contract. *Porpora v. Gatliff Building Co*., 160 Ohio App.3d 843, 847 (2005). "Contract terms are unconscionable if they are unfair and commercially unreasonable." *Gatliff Building*, 160

12

Ohio App.3d. at 847.[2]

Sager contends that the arbitration provision in the Shareholders' Agreement is substantively unconscionable because it goes beyond a mere choice of forum; it deprives her of substantive and procedural rights conferred by federal and Ohio law. This occurs, according to Sager, due to the following prohibition in the arbitration provision: "in any arbitration proceedings ... no information subject to the attorney-client privilege shall be used or disclosed in any manner whatsoever." (Doc. #6, Exh. A). Sager argues that this prohibition eviscerates her discrimination and wrongful discharge claims "because proof of her claims is dependent upon attorney-client information which the arbitration clause expressly precludes her from using in ... arbitration." (Doc. #16 at 14). Sager explains that she has been accused of wrongdoing that allegedly revealed her to be incompetent or unqualified to hold a position with Defendant Coolidge Wall; that she will need evidence to prove her competence and reasonable actions in representing clients of Defendant Coolidge Wall; and that the language of the arbitration provision precludes her from using this probative and material evidence during arbitration.

Contrary to Sager's contentions, an examination of the arbitration provision for unfairness or unreasonableness reveals none. Its language applies equally to Sager and Defendants. It compels both Sager and Defendants to arbitrate any disputes arising under the

---

[2] In Ohio, "[t]he purpose of contract construction is to effectuate the intent of the parties, and that intent is presumed to reside in the language they chose to employ in the agreement." *State ex rel. Petro v. R.J. Reynolds Tobacco Co.* 104 Ohio St.3d 559, 564, (2004) (citation and internal punctuation omitted). Contractual language is given its plain and ordinary meaning; contracts must be read as a whole, giving meaning to all provisions; and ambiguous contract language is strictly construed against the contract's author. *McKay Mach. Co. v. Rodman*, 11 Ohio St.2d 77, 80 (1967); *see Eagle*, 157 Ohio App.3d at 165-66. The parties do not contend that the arbitration provision contains ambiguous terms or that its plain and ordinary meaning does anything other than what it says. Consequently, the issue of whether the arbitration provision is substantively unconscionable does not hinge on the need to interpret any terms of the arbitration provision; instead, it hinges on whether the plain and ordinary meaning of the arbitration provision imposes unfair and unreasonable terms.

Shareholders' Agreement; it imposes a duty on both sides to select one arbitrator, and the resulting two arbitrators select a third arbitrator; the arbitrators' decision is binding on both Sager and Defendants; both sides have the right to seek judicial enforcement. Most significantly, the arbitration provision's prohibitions against the use during arbitration of certain financial information as well as information shielded by the attorney-client privilege applies to both Sager and Defendants. Assuming, as Sager argues, that this will deprive her of the ability to dispute Defendants' likely accusations of her poor or incompetent job performance, this is insufficient to show substantive unconscionability of the arbitration agreement. This is so, as Defendants assert, because the arbitration agreement places both Sager and Defendants on a level playing field by prohibiting both Sager and Defendants from presenting information protected by the attorney-client privilege. Because of this, the arbitration provision on its face is not one-sided at all. *See Vanyo v. Clear Channel Worldwide*, 156 Ohio App.3d 706, 712-13 (2004).

What Sager in essence argues is that the impact of the arbitration provision is one-sided, favoring Defendants much more than Sager by eviscerating her ability to prove her federal and state claims. This, however, fails to assist Sager in showing that the arbitration provision rises to the level of substantive unconscionability because its language itself is simply not one-sided. *See Clear Channel Worldwide*, 156 Ohio App.3d at 712-13 (unfairness not shown by arbitration clause's potential impact on type of fee arrangement between one party and her attorney). Although Sager's arguments do not assist her in showing substantive unconscionability, she also incorporates these arguments in her attempt to show that the arbitration provision deprives her of a forum to effectively vindicate her statutory rights, particularly to be free from workplace discrimination. (Doc. #16 at 24-25). This requires a separate analysis, *see infra*, §IV(C), from

14

determining whether the arbitration provision is substantively unconscionable.

In addition, even if the Court agreed with Sager and found that the arbitration agreement was substantively unconscionable, as the following reveals, Sager's attempt to show invalidity fails for lack of procedural unconscionability.

### 3.
### Procedural Unconscionability

Procedural unconscionability focuses on the "individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible..., or in [other] ... words..., 'bargaining naughtiness.'" *Collins v. Click Camera & Video, Inc*., 86 Ohio App.3d 826, 834 (1993). This is analyzed by examining "factors bearing on the relative bargaining position of the contracting parties, including their age, education, intelligence business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, and whether alterations in the printed terms were possible." *Morrison*, 317 F.3d at 666 (citation omitted). "The crucial question is whether each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print." *Morrison*, 317 F.3d at 666 (citations and internal punctuation omitted); *see Lake Ridge Academy*, 66 Ohio St.3d at 383.

Accepting Sager's allegations as true and construing them in her favor, she has not presented circumstances sufficient to show any procedural unconscionability. Her status as a well-educated, experienced, and accomplished transactional lawyer provided her with the knowledge and skill necessary to fully understand the Shareholders' Agreement including its arbitration provision. She demonstrated her full knowledge and understanding of the arbitration

15

provision through her objections to its inclusion in the Shareholders' Agreement and in her attempt to negotiate its terms with Coolidge Wall.  Her lack of success in doing so does not demonstrate procedural unconscionability, although Defendant Coolidge Wall's take-it-or-leave-it offer of shareholder status does tend to show that Sager lacked bargaining power regarding the arbitration provision.  This, however, is merely one factor to be considered when examining the circumstances of the agreement's formation.  *See Morrison*, 317 F.3d at 666 (listing factors).  Because Sager knew about and fully understood the mandatory arbitration provision, she cannot show that she lacked a reasonable opportunity to understand the arbitration agreement or that its existence or terms were hidden from her when she signed the Shareholders' Agreement.

Sager argues that Defendants unilaterally prevented a meeting of the minds over the arbitration agreement by refusing to negotiate and by placing her in a position where she could not continue to hold her shareholder status unless she agreed to the arbitration provision.[3]  This, however, does not show that Defendants engaged in any bargaining naughtiness at the time Sager signed the Shareholders' Agreement.  Although she did not want the arbitration provision included in the Shareholders' Agreement, under the circumstances she alleges at the time she signed the Shareholders' Agreement, Defendants did not mislead her about the existence or significance of the arbitration provision and did not deprive her of a meaningful choice between her various options such as remaining a shareholder or continuing to work for Defendant Coolidge Wall as an associate attorney or seeking other employment.  Given her education and years of experience as a transactional attorney, she doubtlessly considered these options.  Her

---

[3]  Sager had already been voted shareholder status at the time she objected to the arbitration provision.  *See* Doc. #6 at 22 (citing Sager's affidavit at ¶¶ 17, 18).

decision to sign the Shareholders' Agreement with full knowledge of the arbitration provision establishes that a meeting of the minds occurred between Sager and Defendants over all the terms of the Shareholders' Agreement, including the arbitration provision.

Sager also argues that the arbitration provision rises to the level of an adhesion contract. "[T]he presumption in favor of arbitration should be substantially weaker in a case ... when there are strong indications that the contract at issue is an adhesion contract, and the arbitration clause itself appears to be adhesive in nature.  In this situation, there arises considerable doubt that any true agreement ever existed to submit disputes to arbitration."  *Eagle*, 157 Ohio App.3d at 168 (quoting *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 473 (1998)).  A contract of adhesion is a "[s]tandardized contract form offered to consumers of goods and services on essentially 'take it or leave it' basis without affording [the] consumer [a] realistic opportunity to bargain and under such conditions that [the] consumer cannot obtain desired product or services except by acquiescing in [a] form contract.  Distinctive feature of adhesion contract is that [the] weaker party has no realistic choice as to its terms."  *Sekeres v. Arbaugh*, 31 Ohio St.3d 24, 31 (1987).

The Court assumes in Sager's favor, without deciding, that the Shareholders' Agreement is generally analogous to "a standardized contract form offered to consumers of goods and services...," *id*., and that it is therefore the type of contract falling within the universe of potential adhesion contracts.  The Court also accepts as true Sager's allegations that Defendants refused to negotiate the terms of the Shareholders' Agreement and rejected Sager's objections to the arbitration provision.  In this manner, Defendants presented their offer of shareholder status to Sager on a take-it-or-leave-it basis, much like an adhesion contract in consumer transactions. However, in light of all the circumstances, particularly Sager's education, skill, experience, and

knowledge of the arbitration provision, the Shareholders' Agreement was not an adhesion contract. The rationale underlying judicial disapproval of adhesion contracts derives from the resulting inequity such contracts impose upon one side to a contract. "Often one party to a contract, being in a position to impose terms upon the other with no realistic opportunity to bargain afforded, would include those standardized clauses in the contract as would unreasonably impose upon the nonbargaining party burdens which were wholly inequitable." *Sekeres*, 31 Ohio St.3d at 31. In the instant case, the inclusion of the mandatory arbitration provision did not skew the terms of the Shareholders' Agreement in Defendants' favor. As discussed above, the arbitration provision imposes terms equally and fairly on both parties. Consequently, although Defendants assumed a take-it-or-leave-it posture, this did not impose wholly inequitable contractual burdens upon Sager.

Accordingly, Sager's contentions that the arbitration provision is invalid and unenforceable lack merit.

### C. <u>Effective Vindication</u>

#### 1.
#### <u>Arbitration and Vindication</u>

"[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 123 (2001)(quoting *Gilmer v. Interstate/Johnson Lane Corp*. 500 U.S. 20, 26 (1991)). "[T]he specific arbitral forum provided for in an arbitration agreement must nevertheless allow for the effective vindication of that claim. Otherwise, arbitration of the claim conflicts with the statute's purpose of both providing

18

individual relief and generally deterring unlawful conduct through the enforcement of its

provisions." *Floss*, 211 F.3d at 313; *see McMullen v. Meijer, Inc*., 355 F.3d 485, 490 (6th Cir.

2004).

      The focal point here is on impediments to a party's substantive rights created by the

arbitration provision. "[W]here an individual is unable to vindicate his or her rights because of

an obstacle erected by an arbitration agreement, the court may not enforce the arbitration

agreement." *McMullen*, 355 F.3d at 491 (citation omitted). Federal statutory claims are

arbitrable only when arbitration can serve the same remedial and deterrent functions as litigation.

*See Morrison*, 317 F.3d at 670; *see also Floss*, 211 F.3d at 313.

**2.**
**Title VII and Effective Vindication**

      Sager contends:

      [T]he arbitration clause, as applied to this case, eviscerates [her] discrimination and wrongful discharge claims because proof of her claims is dependent upon attorney-client protected information which the arbitration clause expressly precludes her from using in such arbitration and improperly limits her discovery rights. The arbitration provisions sanctions discrimination by Defendants based upon gender using malpractice as a pretext, knowing that the employee cannot use evidence in the underlying case to prove her competency. The arbitration forum does not provide an effective substitute for a judicial forum but rather, unilaterally shields the employer from exposure of these actions. Further, limiting discovery through arbitration would be the equivalent to directing a verdict in Defendants' favor due to Ms. Sager's inability to discover facts to prove essential elements of her claim.

(Doc. #16 at 25).

      What these arguments miss is that the arbitration provision's prohibition against the use

of attorney-client information imposes no greater restriction during arbitration than she would

face during litigation in this Court. The attorney-client privilege applies in both arenas.

Consequently, the prohibition against the use of attorney-client information imposed by the arbitration provision imposes no greater imposition upon her ability to vindicate her rights under Title VII, the EPA, or ERISA than do the Federal Rules of Civil Procedure.  This conclusion is reached with a full understanding of the burden of proof Sager faces in both forums.

Sager's claims that Defendants discriminated against her on the basis of her sex in violation of Title VII and Ohio statutory law are analyzed in the same manner.  *See Coryell v. Bank One Trust Co., N.A.*, 101 Ohio St.3d 175, 179 (2004); *see also Little Forest Med. Ctr. v. Ohio Civil Rights Comm*., 61 Ohio St.3d 607, 609-10 (1991).  Sager may therefore prove these claims by presenting direct evidence of gender discrimination or indirect evidence under the *McDonnell Douglas-Burdine*[4] burden-shifting framework.  *See Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995); *see also Mauzy v. Kelly Services, Inc*., 75 Ohio St.3d 578, 584-85 (1996).

To support an indirect or circumstantial case of sex discrimination, Sager will bear the initial burden to produce evidence of a *prima facie* case of intentional discrimination.  *See McDonnell Douglas*, 411 U.S. at 802.  If she succeeds, a rebuttable presumption of intentional discrimination arises.  *Burdine*, 450 U.S. at 254.  To rebut this presumption, her employer must articulate a legitimate non-discriminatory reason for its employment decisions.  *Burdine*, 450 U.S. at 254.  If her employer meets this burden of production, "the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity...."  *Burdine*, 450 U.S. at 254.  Sager must then "prove by a preponderance of the evidence that the

---

[4]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

legitimate reasons offered by the defendant were not its true reasons, but were a pretext for unlawful discrimination." *Burdine*, 450 U.S. at 254.

Sager's effective-vindication challenge to the arbitration provision focuses on her burden and potential inability to show the existence of pretext in Defendants' assertion that she was unqualified to be a Coolidge Wall attorney or shareholder.[5]  Sager's burden of proof is the same in both the arbitral and judicial forums because in both settings she may present indirect evidence of Defendants' intent to discriminate by way of the *McDonnell-Douglas* framework. Because Sager's burden of proof is the same in both forums – and more significantly because the attorney-client privilege applies equally in both – Sager's reliance on her burden to show pretext and intentional discrimination does not support her effective-vindication challenge to the arbitration provision.

As to potential or actual limits on Sager's ability to conduct discovery during arbitration concerning pretext, for two reasons such limits fail to demonstrate that arbitration will eviscerate her rights under Title VII, the EPA, or similar Ohio laws.  First, Sager's reliance on the arbitration provision's imposition of the attorney-client privilege does not show that the arbitration provision will prevent her from effective vindication since this provision merely emphasizes the applicability of the attorney-client privilege during arbitration.  In so doing, the arbitration provision sets the same groundrules in arbitration that would apply in the instant case where the attorney-client privilege would be fully in play throughout the litigation.  Because of this, her ability to vindicate her statutory rights during arbitration is the same as her ability to do

---

[5]  Defendants state that Coolidge Wall "has not made claims of unethical behavior or wrongful conduct concerning client matters against Sager leading to her expulsion...."  (Doc. #24 at 15).  Despite this, the Court at this stage of the case accepts Sager's contention that Defendants will assert her competence or qualifications as a grounds for terminating her shareholder status.

so in this Court.  Second, a limitation on discovery during arbitration is by itself not a forbidden evil.  "[T]he opportunity to undertake extensive discovery is not necessarily appropriate in an arbitral forum, the purpose of which is to reduce the costs of dispute resolution.  Indeed, when parties enter arbitration agreements at arms-length they typically should expect the extent of discovery will be more circumscribed than in a judicial setting...."  *Walker v. Ryan's Family Steak House, Inc*., 400 F.3d 370, 387 (6th Cir. 2005).  Although the Court of Appeals in *Walker* refused to enforce an arbitration clause that severely limited discovery, *Walker* is factually distinguished from the instant case because the arbitration clause at issue in *Walker* permitted only one deposition unless the arbitration panel, in its discretion, permitted additional depositions.  400 F.3d at 387.  This was problematic because the procedure for selecting the arbitration panel was biased, a structural problems that left additional discovery in the hands of a biased panel.  *Id*. at 387-88.  The *Walker* Court specifically found, "A structural bias in the make-up of the arbitration panel, which would stymie a party's attempt to marshal the evidence to prove or defend a claim, can be just as prejudicial as arbitral bias in the final decision on the merits."  400 F.3d at 388.

In the instant, the application of the attorney-client privilege, or any potential limitation on discovery, is not left to the discretion of a <u>biased</u> arbitration panel.  This is so because the arbitration provision contains an even-handed, unbiased method of selecting the arbitration panel.  In doing so, it does not impose a structural bias in the make-up of the arbitration panel.  Thus, unlike *Walker*, the instant case does not severely limit discovery then give control of additional discovery to the discretion of a biased arbitration panel.  *Walker* therefore does not assist Sager is avoiding her agreement to arbitrate.

The Supreme Court, moreover, has soundly rejected the notion that arbitration is inherently disadvantageous to Title VII plaintiffs, stating:

> Furthermore, for parties to employment contracts..., there are real benefits to the enforcement of arbitration provisions.  We have been clear in rejecting the supposition that the advantages of arbitration somehow disappear when transferred to the employment context....  Arbitration agreements allow parties to avoid the costs of litigation, a benefit that may be of particular importance in employment litigation, which often involves smaller sums of money than disputes concerning commercial contracts....
>
> The Court has been quite specific in holding that arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law; ... '[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral rather than a judicial forum.'

*Circuit City*, 532 U.S. at 123.

Accordingly, the arbitration provision provides Sager with an arbitral forum that permits her the opportunity to effectively vindicate her rights under Title VII, the EPA, and Ohio statutory law.

### D.   <u>Waiver</u>

Sager next argues that Defendants have waived their right to arbitrate by knowingly acting contrary to the arbitration provision for over nine months.  This occurred, according to Sager, when Defendants engaged in a course of negotiations that gave her "a reasonable 'basis ... to believe Defendants agreed that the matters were not the type for which arbitration applied.'" (Doc. #16 at 31)(quoting in part Sager's affidavit).  Sager explains, "From June 2003, the start of her disputes with Coolidge Wall which form the basis of those claims contained in her Complaint, and through May 2004, never did Coolidge Wall or any individual defendants

mention any requirement or intent to arbitrate any claims or give Ms. Sager any written notice of any intent to arbitrate." (Doc. #16 at 31). Sager also contends that the arbitration provision and Section 27[6] the Shareholders' Agreement required Defendants to provide notice to her of any intent to arbitrate, which they failed to do, thereby revealing their waiver of their right to compel arbitration.

Defendants contend that they have acted consistently with the agreement to arbitrate and have not waived any right to arbitrate.[7]

"[A]n agreement to arbitrate may be waived by the actions of a party which are completely inconsistent with any reliance thereon." *General Star National Insur. Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434, 438 (6th Cir. 2002)(quoting *Germany v. River Terminal Ry. Co.*, 477 F.2d 546, 547 (6th Cir. 1973)). "Although a waiver of the right to arbitration is 'not to be lightly inferred,' ... a party may waive their right by delaying its assertion to such an extent that the opposing party incurs actual prejudice." *General Star*, 289 F.3d at 438 (quoting in part *MicroStrategy, Inc. v. Lauricia*, 268 F.3d 244, 249 (4th Cir. 2001)(other citation omitted)); *see O.J. Distributing, Inc. v. Hornell Brewing Company, Inc.*, 340 F.3d 345, 355-56 (6th Cir. 2003). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language

---

[6] Section 27 of the Shareholders' Agreement generally sets forth the procedures for giving notice when the Agreement requires such notice. (Doc. # 6, Exh. A). Section 27's plain and unambiguous procedural language by itself did not create a duty to notify.

[7] Defendants' Reply Memorandum in part relies on an attorney's affidavit. (Doc. #24, Exh. F). In his affidavit, the attorney bluntly contradicts Sager's version of the events by stating that he informed Sager's former attorney of Coolidge Wall's position that Sager's dispute was subject to mandatory arbitration. *Id*. At this stage of the case, this affidavit must be rejected since Defendants seek to compel arbitration prior to providing Sager with the opportunity to conduct discovery. This affidavit thus plays no role in this Report and Recommendation.

itself or an allegation of waiver, delay, or a like defense to arbitrability." *Javitch v. First Union Securities, Inc*., 315 F.3d 619, 624 (6th Cir. 2003)(quoting *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24-25).

Defendants have not engaged in conduct that was completely inconsistent with their present desire to enforce the arbitration provision. Sager states in her affidavit that after her expulsion from Coolidge Wall on November 7, 2003, her attorney repeatedly contacted Coolidge Wall to advise them she was going to file a lawsuit if they could not reach a settlement. (Doc. #16, Sager affid. at ¶28). She further states:

> These attempts continued until February 2004, when my attorney sent Coolidge a draft of the complaint ... in one final attempt to gain cooperation from Coolidge in settlement negotiations. Coolidge would not cooperate, repeatedly insisting that it was not liable for any wrongdoing. It never once took the position that arbitration was mandatory or advised me verbally or in writing that it wanted to arbitrate our dispute.

*Id*. Accepting these allegations as true does not demonstrate that Defendants acted in a manner completely inconsistent with its present reliance on the arbitration provision. The most that can be reasonably construed in Sager's favor from her allegations is that Defendants' silence during this time period showed their lack of desire to arbitrate any claim they might have had against Sager. This is the most that can be reasonably inferred because Defendants did not face any judicial action by Sager until she filed her case in state court in June 2004. Coolidge Wall immediately responded to Sager's case by filing – the next morning – a Motion to Dismiss, to Compel Arbitration, and to Stay Proceedings. (Doc. #24 at 26). Prior to this, Defendants faced no claim in state court and thus had no reason to invoke the mandatory arbitration provision of the Shareholders' Agreement. Under these circumstances, Defendants have not engaged in conduct completely at odds with their present desire to arbitrate, and they have not therefore

waived their right to invoke the arbitration provision.

Even if the Court concluded that Defendants had engaged in such conduct, Sager has not demonstrated that Defendants caused her actual prejudice.  Sager alleges (again allegations accepted as true) that she "spent hundreds of hours, to her prejudice, preparing for the lawsuit she notified Defendants she planned to file against them.  [She] organized and copied hundreds of documents for her then attorney, prepared numerous affidavits, memos, and summary, spent many hours drafting discovery requests and performing legal work.  For the first six months, following her termination she drove on a regular basis from her home in West Chester to Dayton to deliver documents to her attorney for the lawsuit and consult with him for the very purpose of the lawsuit...."  (Doc. #16 at 28).  Sager argues that this constituted prejudice in the form of time, costs, and expenses.  *Id*.  This, however, does not demonstrate that Sager has suffered any actual prejudice to her ability to pursue or prove her claims.  Her allegations merely show some added expense and burden to her without showing that Defendants' conduct deprived her of evidence or witnesses or have in some prejudiced her ability to prove her claims.

Accordingly, Defendants did not waive their reliance on the arbitration provision.

### E.    Claims beyond the Shareholders' Agreement

Sager contends that her claims arise under documents separate and apart from the Shareholders' Agreement – Coolidge Wall's Code of Regulations and Pension Plan.  Sager states that only the Shareholders' Agreement contained a mandatory arbitration provision.  She therefore reasons that because her claims arise from violations of the Code of Regulations or Pension Plan, her claims are not within the scope of the Shareholders' Agreement and therefore are not subject to its mandatory arbitration provision.  Sager explains that each Count of her

26

Complaint is based, at least in part, on the Code of Regulations or the Pension Plan.  (Doc. #16 at 32-33).

Sager correctly recognizes that the arbitration provision begins, "Any dispute or controversy **arising under this agreement** shall be determined and settled by arbitration...." (Doc. #6, Exh. A at ¶23)(emphasis added).  The plain and unambiguous meaning of this language establishes the parties' intent to arbitrate any claims arising under the Shareholders' Agreement.  This language, however, encompasses all of Sager's claims because without her status as a shareholder (or former shareholder) – which the Shareholders' Agreement created – Sager would have no potential claims or rights under the Code of Regulations or the Pension Plan.  *See Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc*., 350 F.3d 568, 577 (6th Cir. 2003)("where the arbitration clause is broad, only an express provision excluding a specific dispute, or 'the most forceful evidence of a purpose to exclude the claim from arbitration,' will remove the dispute from consideration by the arbitrators."); *see also Fazio*, 340 F.3d at 395 ("A proper method of analysis here is to ask if an action could be maintained without reference to the contract or relationship at issue.  If it could, it is likely outside the scope of the arbitration agreement." (emphasis added)).

The arbitration provision in the Shareholders' Agreement does not contain language limiting the Shareholders' Agreement as the sole source of a dispute or controversy subject to mandatory arbitration.  In other words, as long as the claim arises from Sager's former shareholder status, which was created by the Shareholders' Agreement, it may also be grounded on other claimed sources of rights including the Code of Regulations or the Pension Plan without falling outside the arbitration provision.  Consequently, Sager errs by looking to the Code of

Regulations and Pension Plan to escape the arbitration provision when each of her claims arises at least in part from her former status as a shareholder and hence from the Shareholders' Agreement.

Accordingly, Sager's reliance on the Code of Regulations and Pension Plan does not assist her in avoiding the arbitration provision.

### F.    Sager's Status as an "Employee"

Defendants contend that Sager was not an "employee" of Coolidge Wall but was instead a shareholder.  As a result, according to Defendants, neither Title VII, the EPA, or Ohio statutory law provide her with judicially enforceable rights to be free from employment discrimination.

Sager contends that her status as a shareholder of Coolidge Wall was in name only with the control of the lawfirm residing in a small executive committee.  Sager thus contends that she was an "employee" of Coolidge Wall even though she held shareholder status.

The parties' arguments with regard to whether Sager was an "employee" within the meaning of Title VII, the EPA, or Ohio statutory law raise issues that must be resolved by the arbitrator.  "[T]he Supreme Court has held that once a court determines that the agreement to arbitrate has not been fraudulently induced, all other issues falling within that agreement are to be sent to arbitration."  *Ferro Corp. v. Garrison Industries, Inc.*, 142 F.3d 926, 933 (6th Cir. 1998)(discussing *Prima Paint Corp. v. Flood & Conklin Mfg*., 388 U.S. 395, 403-04 (1967)). Because the parties' arbitration provision is valid and enforceable, and because the issue of whether Sager is an "employee" is integral to her claims under Title VII, EPA, and Ohio anti-discrimination statutes, this issue must be left to the arbitration panel to resolve in the first instance.

The Court notes Defendants' assertion that the "determination of whether a shareholder is an employer or an employee is made as a matter of law."  (Doc. #24 at 2).  It is a more accurate reflection of applicable case law, particularly *Simpson v. Ernst & Young*, 100 F.3d 436 (6th Cir. 1997), to recognize that in absence of a conflict of material fact, it is appropriate for the court to resolve this issue as a matter of law.  100 F.3d at 439, 442-44.  Indeed, the issue presents a mixed question of law and fact, although in many cases it is capable of resolution by the Court as a matter of law because no genuine dispute exists over the material facts.  *See id*.; *see also Lilley v. BTM Corp*., 958 F.2d 746, 750 n.1 (6th Cir. 1992).  Whether genuine issues of material fact exist as to Sager's employee/shareholder status must be resolved by the arbitration panel, subject to the parties' rights to conduct discovery directed at illuminating the actual nature of Sager's relationship with Coolidge Wall.  *See Simpson*, 100 F.3d at 439, 442-44.

Accordingly, the parties' contentions regarding whether Sager was an "employee" within the meaning of Title VII, the EPA, and Ohio statutory law must be resolved by the arbitration panel.

### G.    Dismissal is Warranted

Defendants seek an Order dismissing this case and compelling arbitration or alternatively an Order staying this case pending the conclusion of arbitration.

"The Supreme Court has stated that when the a dispute is subject to arbitration, the FAA 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'"  *Orcutt*, 199 F.Supp.2d at 756-57 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).  "The Sixth Circuit has permitted courts to dismiss

cases, subject to reinstatement, where there 'is nothing left for the district court to do but execute judgment.'" *Orcutt,* 199 F.Supp.2d at 756-57 (citing *Arnold v. Arnold Corp.-Printed Communications for Business,* 920 F.2d 1269, 1276 (6th Cir.1990))(other citation omitted).

Since Sager's claims fall within the scope of the parties' mandatory arbitration provision, dismissal of the instant case without prejudice, rather than a stay, is warranted. *See Orcutt*, 199 F.Supp.2d at 756-57.

## IT IS THEREFORE RECOMMENDED THAT:

1. Defendants' Motion to Dismiss (Doc. #6) be GRANTED, and pursuant to the FAA, Sager's claims be DISMISSED without prejudice to renewal after she proceeds in arbitration pursuant to the terms of the parties' arbitration agreement;

2. Sager's Motion for Rule 56(f) Relief (Doc. #24) be DENIED;

3. Sager's Omnibus Motion to Convert Defendants' Motion to Dismiss to Motion for Summary Judgment; Sager's Request for Extended Deadline for the Parties to Submit Evidence; Sager's Request for Evidentiary Hearing; and Sager's Request for Oral Argument (Doc. #26) be DENIED;

4. Defendants' Motion for a Protective Order (Doc. #10) be DENIED as moot; and

5. The case be terminated on the docket of this Court.

September 6, 2005                                        s/Sharon L. Ovington
                                                         Sharon L. Ovington
                                                  United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).

31